In the Matter of the Estate of MARY MURNANE, Deceased.

Surrogate's Court, New York County, April 11, 1933.

*Samuel Komoroff*, for the executor.

*J. Francis Lynch*, for the respondents.

DELEHANTY, S.   Mary Murnane died July 27, 1932.   Her employers, Mr. and Miss Smidt, esteemed her as a faithful servant and friend, and when they were arranging to go away for the summer they had deceased removed to claimants' home as a temporary solution of the problem of her care during their absence.   Claimant Thomas Cavanaugh is a nephew of deceased.   Mary Cavanaugh,

the other claimant, is the wife of Thomas. There is little doubt that deceased received kindly treatment from claimants during her seven weeks' stay ending in her death. If the question here were whether claimants were adequately compensated for her care by the sums received from the employers of deceased the answer probably should be in the negative.

Deceased had had her will drawn by her employer (an official in a large bank) and had left it in his custody. After granting some small legacies it gives the residue to relatives in Ireland. She had also left with this employer a savings bank book showing some balance to her credit. Shortly before going to live with claimants she had drawn $150 in cash. So far as her employers knew, the balance remaining in the bank from which this cash was drawn, the two trunks containing (as was supposed) her apparel only and this cash, constituted her entire resources. Actually, but unknown to others, she had accumulated in another bank a sum in excess of $5,000. The book evidencing this deposit was in one of deceased's trunks (both of which were taken to claimants' home) and the ownership of this book is the subject-matter of the present inquiry.

Title to the bank book in question is predicated upon an alleged gift *inter vivos* made, as it is claimed, on June thirtieth, some four weeks before the death of deceased. Shortly before noon on a particular day (the date is in dispute) a next-door neighbor, James A. Griffin, attended at claimants' home at the request of deceased and participated in the emptying of two trunks of deceased and in the unwrapping of various parcels therein containing articles apparently accumulated and kept by deceased over a period of many years. In the course of this process, various articles were delivered over to Mary Cavanaugh, one of claimants. This neighbor, it is alleged, was called back to his own home for lunch before the process of opening the parcels in the trunks was completed and another neighbor from across the street, one Cornelius Foley, is said to have been present when the bank book in question was physically delivered to Mary Cavanaugh by deceased, with accompanying words of present gift. A daughter of claimants is said also to have been within ear-shot, though not in the room, and to have heard these words of gift and is said to have seen the book later in her mother's possession. Claimants' witness, John Carroll, testified to a conversation with deceased on July tenth, and quotes deceased as then saying that her prayers had obtained a job for Thomas Cavanaugh and that in any event claimants need have no further worries as she had given them her bank book. Another witness, Gertrude M. Knight, testified that she had visited claimants' home on July fifth, and there had seen articles which

deceased had given to Mary Cavanaugh and, she states, deceased in her presence asked Mary Cavanaugh whether the witness had been shown the bank book and Mary Cavanaugh thereupon got the bank book from another room and showed it to the witness.

If credited, the foregoing proofs suffice to establish a valid gift *inter vivos* and ownership by claimants of the bank book and the fund which it represents.

On the hearing it was assumed as true that deceased directed the presence of the next-door neighbor and that she made some ceremony of the opening of the trunks and of the unwrapping and inspection of the parcels therein and of the disposal thereof. Indeed the letter of Thomas Cavanaugh (Exhibit 13, hereafter quoted) establishes that deceased called in this neighbor to assure independent proof of what actually transpired. Claimants' case must fail unless Griffin was absent at the time of the alleged gift of the bank book and unless also the witness Foley was fortuitously present thereat. Foley says that he did not remain to witness the disposal of the contents of the trunks. On claimants' proof, this distribution of her goods, so ceremoniously commenced by deceased, was continued and concluded by her in the absence of her chosen witness and without any witness other than Mary Cavanaugh. Contra claimants' version of the transaction is that of Griffin (the witness selected by deceased) who states explicitly that the date was not June thirtieth, but July twelfth, and that the process of unwrapping and of examination was completed in his presence. He says that many articles in the trunks were wrapped in packages, some dated as early as 1896, and that certain items which were given to Mary Cavanaugh were put on a shelf in the latter's room where the witness assisted her in placing them. He states that Cornelius Foley was in the room for only two or three minutes and that in this interval a package containing red flannel underwear was opened and the underwear exhibited to Foley causing some merriment on the part of those present. He says that after the inspection was complete the articles retained by deceased (including one in particular which deceased withheld from inspection) were replaced in the trunks which were locked by keys in the possession of deceased. Concededly until her death the trunks were still in the room occupied by deceased. Griffin states that no bank book was exhibited and that no gift was made of the trunks but only of specific items taken therefrom.

Another neighbor (Helen O'Keefe) testified that she had visited deceased frequently, including the day she died, and that on that day she saw claimant Mary Cavanaugh take a bag out of the trunk of deceased after unlocking it with a key that was on the dresser in

deceased's room. She says that at this time deceased was approaching dissolution and could not talk. This witness says that after taking out this bag Mary Cavanaugh relocked the trunk, put the key on the dresser, left the room with the bag, returned without it and on her return whispered to the witness that in the bag was $85 in cash and a bank book showing a balance of over $5,000. The witness quotes this claimant as saying when taking the bag that she was taking it so that in case " they " should come up " they " wouldn't find it in the trunk."

The testimony of Griffin was bitterly attacked and he was asserted to be unworthy of belief. It cannot be denied that deceased deemed him a reliable witness when she called him in. A Mrs. Haley was called and testified that Griffin had told her that he had witnessed the gift by deceased to claimants of *two* trunks, *two* bags, *two* rings and *two* bank books. These *two* bank books must needs include the one in possession of deceased's employer, which is not claimed at all. The $85 in cash remaining out of the $150 drawn by deceased prior to her going to claimants' home is not claimed by them. Indeed they have stated on the record that this balance belongs to the estate. It is not clear why deceased omitted this cash from the alleged gift, if any were made as claimed by them.

Claimant Mary Cavanaugh testified that she had had a conversation with Griffin and had asked him to sign a statement which he refused to do unless paid $100. Her testimony on this point follows: " Q. Mrs. Cavanaugh, did you ever have a conversation with Mr. Griffin, who testified here today, at Interstate Park? A. Yes, I did. Q. When did that conversation take place? A. I just don't remember what week it was, but it was in August, my little boy was up there, and I had a paper I wanted him to sign. Q. Just a minute. Will you tell us the substance of the conversation, what you said to him and what he said to you? A. We met down by the water, the boys were swimming, and he said, ' Well, how are you? ' I said, ' I am fine, thank you.' He said, ' I am all right, thank you; ' general conversation. I said to him, ' By the way, I have a paper here. Do you want to sign it? ' He said, ' What about? ' I said, ' *Proving that you were there when Aunt Mary gave me the trunks and the bank book.*' He said, ' No, I am not signing it.' I said, ' Why? ' He said, ' What will Tom offer me, ten dollars? ' I said, ' What do you expect? ' He said, ' A hundred.' I said, ' What do you mean? ' He said, ' Fifty to buy a suit of clothes now, and fifty when the trial comes up,' and he had my husband's clothes, too. Q. What did you say to him? A. I told him, if I had to pay him to tell the truth, I didn't want him."

This testimony of Mary Cavanaugh asserts two facts of major importance. The first is that Griffin was asked for his signature in *August,* and refused it then and the second is that Griffin was asked to swear that he had been present " when Aunt Mary gave me [Mrs. Cavanaugh] the trunks and the bank book." Since claimant's effort in August was to establish that Griffin was present at the gift of the bank book, it follows necessarily that the testimony of the witness Foley (who was called to prove the contrary) was known by claimants to be false when presented on this hearing or, in the alternative, that claimants were suborning perjured testimony in August. It was not until *September* and after the failure to procure the statement from Griffin that written statements were procured from Foley and others. The statement of Foley (Petitioner's Exhibit 3) recites the names of the persons present in the room at the time of the alleged gift and, among others, names " Kathryn Cavanaugh, daughter of Thomas J. Cavanaugh." Kathryn Cavanaugh herself testified that she was *not* in the room. It is noteworthy too that this same statement of Foley says not a word of the fact to which he testified *in extenso* upon the hearing that he had immediately reported the details of the alleged gift to his wife. Neither does the statement of Foley's wife (also in evidence as petitioner's Exhibit 4) contain any reference to her having heard anything about the gift from her husband on that occasion or at any time from any person.

There were produced and marked in evidence petitioner's Exhibits 13, 15 and 16 which are respectively a letter dated " August," 1932, a form of statement inclosed therewith and a letter dated October 4, 1932. The letters (Petitioner's Exhibits 13 and 16) are each in the handwriting of claimant Thomas Cavanaugh. The statement (Exhibit 15) was inclosed with Exhibit 13 and the text of it is hence to be deemed a text prepared by this claimant.

In the letter (Exhibit 13) claimant wrote: " When Aunt Mary came with us she brought all her personal belongings with her in two trunks. Even her plants that she was very proud of. * * * One day, after she had been with us two weeks or so, she called in a neighbor and went through her trunks with my wife. She told my wife then and there that all and everything contained in the trunks she was giving to her (my wife) and myself for making her so happy. I was put out about it as I felt that inasmuch as I was her nephew I could have helped her just as well. She told me she knew that but she had a purpose in mind and that this neighbor was no relation and therefore a more acceptable witness that she had given my wife and myself the contents of the trunk including a certain bank book. She gave me the ' creeps ' the way she was

talking and I paid no more attention to it. *After she died, we went through the trunks and found many things that she had for a long, long time including the bank book.* I knew she had made a will though I didn't know what was in it. *I took the book to Mr. Smidt thinking he was executor of the estate.* He was dumfounded to find out she had another bank book as he thought Aunt Mary had given him everything she had. I explained the circumstances to him about Aunt Mary *giving us the contents of the trunk.* He and Miss Smidt felt that we had deserved it for what we had done for her * * *. Tho I feel in my heart and soul that *Aunt Mary intended to revise her will as soon as Mr. Smidt came back* from his vacation (he was away when she died). * * * I hope you won't object to signing the enclosed form." (No italics in original.)

The " form " referred to is typewritten and is as follows:

" Date. . . . . . . . . . . . .

" To His Honor, The Judge of the
   " Surrogate Court, City of New York,
               " State of New York.

" We Margaret Murnane and Daniel Murnane, the principal heirs mentioned in the will of our late sister Mary F. Murnane, and dated December 6, 1931, do hereby in accordance with the wishes of our sister, Mary F. Murnane expressed by her prior to her death on July 27, 1932, waive all and any claims we may have as heirs to the estate of our late sister Mary F. Murnane, to all monies on deposit with the Emigrants Savings Bank, located in the City of New York State of New York, and as reflected by bank book of that Institution numbered 1,054,151.

" *We know it was the intent and purpose of our late sister to transfer the above account in the Emigrants Savings Bank to her and our nephew Thomas J. Cavanaugh* of the City of New York for his and his wifes loving care of her during the time she resided with them in their home prior to her death.

" It is our wish that this be done.   " Signed. . . . . . . . . . . . . .

" Witnessed by                   " Signed. . . . . . . . . . . . . .
   " Signed. . . . . . . . . . . . . . . .
   " Signed. . . . . . . . . . . . . . . .
                 " *Notary.*"

(No italics in original.)

In the letter (Petitioner's Exhibit 16) written October 4, 1932, this claimant says:

" Dear AUNT MAGGIE: * * * *I also know Aunt Maggie that if Aunt Mary could have written her name or had lived two weeks longer there would not have been any trouble about her estate.*

*She was giving my wife and myself everything she had for several reasons.* \* \* \* And when she gave us that bank book it was with a certain purpose in mind. She wanted us to get certain things for her and buy other things for ourselves and put the balance in a bank for ourselves. \* \* \* I don't want to hurt you Aunt Maggie but this is what Aunt Mary told me about a month before she died. She said she was sick and tired of sending money home to Ireland and she wasn't going to send any more, next Christmas was to be the last and as for Uncle Danny she was particularly angry at him for reasons she wouldn't give, I would not belie the dead *and again Aunt Maggie I could claim all of Aunt Mary's estate. I have several witnesses, friends of Aunt Mary's who would be willing to testify that she told them she was leaving ' Mary and Tom ' everything. I don't want to do this though everyone else including my lawyer wants me to.* I'll be satisfied with what Aunt Mary actually placed in our hands." (No italics in original.)

The effect of these letters is to discredit wholly the testimony of the witnesses Carroll and Knight. If, as the letter (Exhibit 13) says, the bank book was found in the trunk after deceased died and was then taken by the claimant Thomas Cavanaugh to Mr. Smidt because of the belief that he was the executor, it must be clear that there was no prior delivery of the book to Mary Cavanaugh and no prior exhibit of it to the witness Knight.

When the testimony of the witnesses produced by claimants is matched with the oral testimony of claimant Mary Cavanaugh and the letters of claimant Thomas Cavanaugh. it is not possible to indulge in any belief that the claim is valid.

A study of the testimony and the exhibits permits the inference that this claim has passed through three stages. The primary stage (outlined in the first letter of Thomas Cavanaugh) is that wherein there is reflected the belief on the part of claimants that deceased intended to change her will for their benefit. The witnesses for claimants quote deceased as referring to the return of Mr. Smidt and to her intention then to " fix everything " and " straighten out some matters." To the same effect are portions of the statements signed by claimants' witnesses and produced at the behest of petitioner. These statements are not consistent with claimants' case, since claimants assert that they were given all of deceased's property. There was nothing left to be " fixed," if their claim is sustained. The secondary stage is that wherein apparently the thought of a gift *causa mortis* was considered and was dropped since proof of delivery might not be possible. The third and final stage is that of a gift *inter vivos*. This promised

substantial hope of success until claimant Mary Cavanaugh took the stand and the letters of claimant Thomas Cavanaugh were produced. The situation here presented demonstrates once more the necessity for the rule laid down by the courts that claims of this sort must be supported by clear, convincing and credible proof.

Petitioner has established that the bank book and the funds represented thereby are the property of the estate of Mary Murnane. The claim made by Thomas Cavanaugh and Mary Cavanaugh that a gift thereof had been made to them is without foundation and is dismissed.

Proceed accordingly.